**Carolyn F. FERGUSON, Plaintiff,**

v.

**AMERICAN TELEPHONE & TELEGRAPH COMPANY, Defendant.**

**No. 82–0327–CV–W–1.**

United States District Court,
W.D. Missouri, W.D.

June 2, 1983.

Carl W. Bussey, Colbert & Fields, Kansas City, Mo., for plaintiff.

Jack Headley, Lathrop, Koontz, Righter, Clagett & Norquist, Kansas City, Mo., for defendant.

MEMORANDUM OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

JOHN W. OLIVER, Senior District Judge.

### I. *Introduction*

This combined Title VII and Section 1981 case was tried without a jury, the parties having expressly waived their respective rights to a jury trial in regard to plaintiff's Section 1981 claim. The parties, in accordance with standard pretrial procedures, entered into stipulations of fact in regard to a substantial number of the factual circumstances of this case. Many of the findings of fact proposed by each side are based on those stipulations of fact.

In addition, counsel have admitted that various of the findings of fact proposed by opposing counsel were accurately stated and thus commendably increased the area of undisputed factual data. We have marked the particular paragraphs of the findings of fact made in the next part of this opinion with an asterisk to indicate those findings of fact which have been admitted to be true by opposing counsel.

As will be apparent, we have substantially modified a number of the findings of fact as proposed by the respective parties. We shall also state in various footnotes our rejection of particular proposed findings of fact in order that our resolution of disputed issues of fact be clearly stated for possible appellate review.

We shall find and conclude that the defendant is entitled to a judgment in its favor under the findings of fact made in Part II of this memorandum opinion and under the conclusions of law stated in Part III thereof.

### II. *Findings of Fact*

1.* Defendant American Telephone & Telegraph Company (AT & T) is a corporation doing business in Jackson County, Missouri, and is an employer within the meaning of § 701(b) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e(b). (Stipulation of Facts, ¶ 1).

2.* Plaintiff Carolyn F. Ferguson, a black female, age 32, is a citizen of the United States, a resident of Lenexa, Kansas, and a former employee of defendant. (Stipulation of Facts, ¶ 2).

3.* On October 21, 1974, plaintiff was hired by Southwestern Bell Telephone Company (Southwestern Bell) to work in Little Rock, Arkansas, as an Engineering Associate at a salary of $925.00 per month. Plaintiff was later promoted to a First Level management position with Southwestern Bell. Later, plaintiff was promoted to a Second Level management position with Southwestern Bell. (Stipulations of Fact, ¶ 3).

4.* In September, 1978, plaintiff's husband was transferred in his job with IBM from Little Rock, Arkansas, to St. Louis, Missouri. As a result, plaintiff requested of Southwestern Bell that she be transferred to St. Louis. (Stipulations of Fact, ¶ 4).

5.* Southwestern Bell transferred plaintiff to St. Louis, Missouri on September 15, 1978, where she was assigned the job of

Staff Manager, Network Design, in Engineering and Network Services. This job was a management job, Second Level, Upper Band, and her salary was $27,800.00 per year. (Stipulations of Fact, ¶ 5).

6.* In July, 1980, plaintiff's husband was transferred to Kansas City, Missouri. At plaintiff's request, Southwestern Bell attempted to find a management level position for her with Southwestern Bell in the Kansas City area, but none was available. (Stipulations of Fact, ¶ 6). Southwestern Bell attempted to find a management level position for which plaintiff was qualified with Western Electric in the Kansas City area, but none was available. Southwestern Bell attempted to find a management level position for which plaintiff was qualified with AT & T Long Lines in the Kansas City area, and discovered a possible opening involving a First Level management job in engineering, which was in the area of plaintiff's previous job experience.

7. On July 22, 1980, plaintiff discussed this job opening with James Johnson, a third level manager with AT & T Long Lines, who was looking for candidates for this job. Johnson advised plaintiff that this job was at a lower level than the job plaintiff had with Southwestern Bell, that the job entailed no special promises for a promotion for plaintiff, and that plaintiff would have to compete with other First Level managers for promotions. Johnson did not offer the plaintiff any job at the close of their July 22, 1980 meeting. Johnson did not make any promises, commitments or representations to plaintiff regarding either her entry into the MDP Program or promotional opportunities.[1]

8.* On July 28, 1980, and before plaintiff was offered such First Level engineering job, AT & T Long Lines instituted a

hiring freeze order which eliminated this job opening for plaintiff and all other candidates. (D.Ex. 20, 21).

9.* In April, 1980, AT & T Long Lines announced the move of an Accounts and Finance Group, of approximately 15 persons, headed by Willis H. Canada, Third Level management, from New Jersey to Kansas City, Missouri. Most, if not all, employees in this group elected not to be transferred from New Jersey to Kansas City. (Stipulations of Fact, ¶ 7).[2]

10.* After plaintiff's possible job opportunity with AT & T Long Lines in Engineering in Kansas City was eliminated by the hiring freeze, it came to the attention of AT & T Long Lines that there might be an opening for which plaintiff could be considered in Mr. Canada's Accounts and Finance Group, which was still in the process of moving from New Jersey to Kansas City. AT & T Long Lines thought some jobs in Mr. Canada's group in Kansas City might be exempted from the hiring freeze in view of the reluctance of most, if not all, employees in that group to transfer from their homes in New Jersey to Kansas City. (Stipulations of Fact, ¶ 8).[3]

11.* Mr. Canada was contacted by James Johnson about considering plaintiff for a job (Stipulation of Fact, ¶ 9), in view of the fact that her husband had been transferred to Kansas City and plaintiff needed to relocate.

12. In early August, 1980, Mr. Canada telephoned plaintiff in St. Louis and advised her that he had a First Level management job opening and asked if she was interested. Plaintiff said she was interested. Canada then submitted plaintiff's name to his superiors in order to obtain

---

1. We expressly reject plaintiff's proposed finding of fact No. 10 and plaintiff's testimony in regard to what was said at the July 20, 1980 meeting with James Johnson.

2. Defendant paraphrased paragraph 7 of the parties' stipulation in its proposed finding of fact No. 9. Plaintiff admitted most, but not all, of that proposed finding. Our finding of fact in paragraph 9 above is in the exact language of paragraph 7 of the stipulation.

3. The finding of fact stated in paragraph 10 is based on paragraph 8 of the stipulation. Plaintiff admitted all of the finding as proposed by the defendant except that portion of paragraph 8 of the stipulation which stated that "most, if not all" of the New Jersey employees were reluctant to transfer to Kansas City. Consistent with our finding No. 9, we have modified the admitted finding No. 10 to conform with the stipulation of the parties.

approval for the extension of a job offer to plaintiff.

13.* The policy of AT & T Long Lines is that a manager who is looking to fill a job opening in his/her group does not personally interview candidates from within the Bell system. Instead, an Employee Profile on the candidates is submitted which gives detailed information such as the personnel history of the employee, work performance appraisals, educational background and company education and training courses.

14. While in Kansas City on personal business in early August, 1980, plaintiff and her husband, at plaintiff's request, met with Mr. Canada in Canada's office. Canada advised plaintiff that this job was at a lower level than the job plaintiff had with Southwestern Bell, that the job entailed no special promises for a promotion for plaintiff, and that plaintiff would have to compete with other First Level managers for promotions. Canada did not make any promises, commitments, or other representations to plaintiff at that conference, or at any other time, regarding either her entry into the MDP program or promotional opportunities.[4]

15. Under the personnel policies of AT & T Long Lines, neither James Johnson nor Willis Canada had any authority to accept plaintiff into the MDP program. Neither did they have authority to ensure that plaintiff would be promoted into the next available second level position with AT & T Long Lines. We find, contrary to plaintiff's testimony, that neither Johnson, Canada, or any one else ever promised or in any way indicated to plaintiff that she would receive the very next promotional opportunity regardless of who else may be an applicant.

16.* In late August, 1980, Canada received approval from AT & T Long Lines headquarters to offer plaintiff the First Level job in the Accounts & Finance group.

Ralph Rice, a Second Level manager for Canada in Kansas City, then called plaintiff in St. Louis, advising her of this final approval and offered her the job. Plaintiff accepted the job effective August 31, 1980.

17.* On August 31, 1980, plaintiff started employment with AT & T Long Lines at its 63rd Street, Kansas City, Missouri offices as a Staff Accountant, First Level management (12 level), in Mr. Canada's Accounts & Finance group, at the same salary she was receiving from Southwestern Bell, $32,000 per year. This First Level management job constituted a lower level than the Second Level management job plaintiff had with Southwestern Bell (Stipulations of Fact, ¶ 10). Also, this job was in an accounting area, as opposed to engineering area, which was plaintiff's previous experience.

18. From 1974 through 1980, while plaintiff was employed by Southwestern Bell, she received satisfactory performance ratings and assessments of her management potential, as well as regular annual increases of her salary. She was not, however, on Southwestern Bell's Management Development Program (MDP), but instead was on Southwestern Bell's Guidelines for Management Development (GMD) program.[5]

19.* Although plaintiff's employment with AT & T Long Lines was with a new company, the policy of AT & T was to permit persons in the Bell System, such as plaintiff, to retain their seniority so far as pension and vacation benefits were concerned. (Stipulations of Fact, ¶ 11).

20. IBM, the employer of plaintiff's husband, paid for all moving, living, transportation and relocating expenses of plaintiff, her husband and the other members of their family from St. Louis to Kansas City. All transportation, hotel and meal expenses of plaintiff for any trip she made from St.

---

**4.** We expressly reject plaintiff's proposed finding of fact No. 15 and plaintiff's testimony to the effect that Canada assured her at the time of her pre-employment interview with him that the alleged "promises made by Johnson, i.e., promotion to the second level as soon as possible and participation in the Management Devel-

opment Program (MDP) would be honored." (Quoted from plaintiff's proposed and rejected finding of fact No. 15).

**5.** Our finding of fact No. 18 includes that portion of plaintiff's proposed finding of fact No. 6 which defendant admitted was true.

Louis to Kansas City, prior to August 31, 1980 and in connection with her seeking employment with AT & T, were paid for by IBM. No credible evidence was adduced to support a finding that plaintiff, or any other person who transfers to AT & T from another Bell operating company, would be entitled to some form of cost-of-living or home mortgage differential payment from AT & T, based upon the difference in the cost-of-living between Kansas City and St. Louis, her former residence. Nor is there any evidence that the cost-of-living was higher in Kansas City than in St. Louis during August, 1980 when plaintiff moved to Kansas City.[6]

21.* When plaintiff commenced employment in Mr. Canada's group on August 31, 1980, she and certain other First Level managers reported directly to Ralph Rice, a Second Level manager, who in turn reported to Mr. Canada. At that time, there was one other Second Level manager in Canada's group, Pat Kies, who also had First Level managers reporting to her. (Stipulations of Fact, ¶ 12).

22.* Mr. Canada's Accounts & Finance group, in which he held the title of General Accountant, does certain computer design work which another group programs into the AT & T computers. The Accounts & Finance group moved to Kansas City to be closer to these programmers, who already were located in Kansas City. Canada's group in Kansas City was scheduled to have about ten employees by the end of 1980. Presently, it has about fifteen employees who are all management level except for two clerks. (Stipulations of Fact, ¶ 13).

23.* On September 17, 1980, plaintiff filed with the EEOC a Charge of Discrimination against Southwestern Bell, alleging race and sex discrimination in being denied a transfer to Kansas City and a promotion.

(D.Ex. 9, Stipulations of Fact, ¶ 23). Shortly thereafter, plaintiff made known to Mr. Canada and Mr. Rice that she had filed such a charge against Southwestern Bell.

24.* On March 27, 1981 EEOC issued a determination to plaintiff and Southwestern Bell, finding no reasonable cause to believe her charge was true. (D.Ex. 10, Stipulations of Fact, ¶ 24).

25.* Soon after plaintiff commenced her employment with AT & T Long Lines in Kansas City on August 31, 1980, she began asking her immediate superior, Mr. Rice, and Mr. Canada about opportunities to be promoted. (Stipulations of Fact, ¶ 14). She made known to them, as she had earlier to AT & T Long Lines, that she was not mobile (would not relocate to another geographical area), that she did not want a job with extensive travel, and that she was not interested in a job that was "selling oriented."

26.* Beginning in late February, 1981, Ralph Rice and Willis Canada determined that plaintiff was promotable and so advised the personnel department in Kansas City. Thereafter, either Ralph Rice or Willis Canada submitted plaintiff's name pursuant to various AT & T Long Lines intracompany job ads for which they considered plaintiff a qualified candidate or in which plaintiff had expressed an interest. (Stipulations of Fact, ¶ 15).

27. On August 19, 1981, plaintiff filed with the EEOC a Charge of Discrimination against AT & T Long Lines alleging race discrimination in not being promoted. (Stipulations of Fact, ¶ 25). Subsequent to her filing the EEOC charge on August 19, 1981, plaintiff continued to inquire of her immediate superiors, Ralph Rice and Bill Canada, as to the reasons why she had not been promoted and what experience, if any,

---

**6.** Plaintiff's proposed finding of fact No. 19 accurately stated that "Defendant AT & T Long Lines refused to pay plaintiff's moving, temporary living, transportation and relocation expenses from St. Louis to Kansas City and a differential between housing costs in St. Louis and Kansas City." Paragraph 21 of plaintiff's proposed conclusions of law requested that we conclude as a matter of law that the defendant violated Section 1981 "by not paying plaintiff's

moving and temporary living expenses incurred in her move from St. Louis to start work for defendant in Kansas City."

Our finding of fact in paragraph 20 above is intended to reflect our view that, on the facts, defendant was not under any obligation to pay plaintiff for any of the items mentioned in plaintiff's proposed finding of fact No. 19 and in plaintiff's proposed conclusion of law No. 21.

she needed to successfully obtain that promotion.[7]

28.* On February 9, 1982, plaintiff filed with the EEOC an Amended Charge of Discrimination, again alleging race discrimination in not being promoted. In addition, plaintiff alleged further race discrimination in being denied opportunities for high responsibility projects, being denied a company-paid trip to Kansas City to interview, being denied moving and living expenses, not being in the Management Development Program and not being promoted in a year as allegedly promised. Further, the Amended Charge alleged that on February 27, Mr. Canada said that he did not support plaintiff because she had filed an EEOC Complaint. (D.Ex. 5, Stipulations of Fact, ¶ 26).

29.* On February 19, 1982, before the EEOC could complete its investigation and make a Determination, plaintiff requested that the EEOC issue her a right-to-sue notice. (D.Ex. 7). On February 24, 1982, EEOC issued to plaintiff a Notice of Right to Sue. (D.Ex. 8).

30.* On April 29, 1982, plaintiff commenced these proceedings by filing a complaint in this Court.

31.* Plaintiff remained under Ralph Rice's direct supervision in Canada's group until about July, 1982, when Rice was laterally transferred to another group. Thereafter, plaintiff's immediate supervisor became Marvin Von Sprecken, a Second Level manager, who had taken a lateral transfer from New Jersey to Canada's group in February or March, 1981. A lateral transfer is the movement of an employee into a job at the same level as the job previously held by that employee. A decision had been made not to refill Ralph Rice's job position. (Stipulations of Fact, ¶ 16).

32. Beginning about April or May, 1982, plaintiff's work performance and work attitude began to change. She missed time deadlines for completion of certain work and problems on accuracy were being encountered with her work product.[8]

33.* However, until late December, 1982, or early January, 1983, either Mr. Von Sprecken or Mr. Canada continued to submit plaintiff's name for various job promotion opportunities, as had been done when Ralph Rice was plaintiff's immediate supervisor.

34. Problems with plaintiff's work performance and work attitude continued. Plaintiff, on occasion, refused to follow directions and orders from her immediate supervisor, Marvin Von Sprecken. Errors continued in her work product and she missed time deadlines for work completion.

35. In the fall of 1982, a special conference was held with plaintiff at which plaintiff's work performance was discussed and at which Canada and Von Sprecken specifically discussed such items as plaintiff's accuracy, timeliness, interaction with the team and self-improvement.[9]

---

**7.** The first sentence of our finding of fact No. 27 is based on paragraph 25 of the parties' stipulation; the second sentence adopts paragraph 41 of plaintiff's proposed finding of fact 41. We included the second sentence in the above finding of fact to emphasize plaintiff's consistent preoccupation with her belief that she was somehow entitled to greater promotion consideration than that offered other employees of Southwestern Bell and the defendant.

**8.** Plaintiff's proposed findings of fact Nos. 45 and 51 and plaintiff's testimony at trial reflect plaintiff's factual theory that her work performance and work attitude were exemplary "between August 19, 1981 until about August, 1982, when Ralph Rice [was] plaintiff's immediate superior," and her contention that it was not until "August, 1982, when plaintiff's immediate supervisor became Marvin Von Sprecken [that] her job performance allegedly began to immediately deteriorate." It is plaintiff's factual contention that it was only after August, 1982 that "plaintiff began to receive numerous complaints from Mr. Von Sprecken about alleged errors in her work, alleged failure to complete her work on time, [and] alleged failure to interact with her co-workers." Plaintiff also contends that after Von Sprecken became her supervisor in August, 1982, "unfavorable documentation regarding her job performance was being assembled."

Our finding of fact in paragraph 32 reflects our acceptance of defendant's evidence in regard to the fact and time of commencement of the deterioration of plaintiff's job performance and our express rejection of plaintiff's factual contentions as above stated.

**9.** Plaintiff's proposed finding of fact No. 53 stated: "Plaintiff's desk file included very little

36. On February 25, 1983 Mr. Canada, Mr. Von Sprecken and plaintiff had a conference during which plaintiff's work performance was discussed. Plaintiff was advised that specific items of her work performance were not satisfactory. These items included the inaccuracy of her work product, her need to issue many corrective supplements to her work product, her failure to meet time commitments, her failure to follow established office procedures, her lack of cooperation with both her supervisor and other team members, and her defiance in refusing to do assigned work. (D.Ex. 16, pp. 27–31). Plaintiff was told to prepare a development plan, covering a period of three months and setting out her ideas on what she could do to improve her work performance. Plaintiff was told to submit her Development Plan to Mr. Von Sprecken for further discussion about it.[10]

37.* Plaintiff did not do a development plan. On April 1, 1983, Mr. Von Sprecken placed a memo on plaintiff's desk which stated that he had not received anything from her on this plan, and that it should be completed no later than April 8, 1983. (Stipulations of Fact, ¶ 18).[11]

38. Not having heard from plaintiff as a result of his April 1, 1983 memo, Mr. Von Sprecken, plaintiff's immediate supervisor, twice during the afternoon of Tuesday, April 5, 1983, went to plaintiff's desk and asked her to come to his office. Mr. Von Sprecken's first request was made at 2:30 p.m. Plaintiff was asked to come to Mr. Von Sprecken's office at 4:00 p.m. to discuss the status of plaintiff's work. When plaintiff failed to come to his office at 4:00 p.m., as requested, Von Sprecken went to plaintiff's desk, at about 4:15 p.m., and again asked her to come to his desk. Plaintiff asked what for and Von Sprecken said to discuss the status of plaintiff's part on a depreciation project and to discuss plaintiff's development plan. Plaintiff advised Von Sprecken that she had not agreed to do a development plan. Von Sprecken told her to come to his desk and returned to his office. Von Sprecken waited for a half hour and, when plaintiff failed to appear at his desk, he went to her desk for the third time, at about 4:45 p.m. Plaintiff immediately turned her back on Von Sprecken. Von Sprecken then told plaintiff her insubordination could not continue and he was suspending plaintiff for five work days without pay. Plaintiff was directed to report back to work on Wednesday, April 13, 1983. Plaintiff told Von Sprecken that he was not her supervisor, that she did not have to do what he said and that she was not on suspension. Plaintiff demanded that Von Sprecken put the suspension in writing and that he document it with reason for the suspension and the written company policy supporting such action. Von Sprecken advised her that he was her supervisor, that he could suspend her, that he did not have to put it in writing and that she was suspended for five work days. Von Sprecken

documentation of poor work performance from August, 1982 until February, 1983." The findings we have made in paragraphs 34 and 35 above are based on the testimony of the trial witnesses and again reflect our rejection of the plaintiff's testimony and factual theory that her difficulties resulted primarily from the fact that Marvin Von Sprecken succeeded Ralph Rice as her supervisor in August, 1982.

10. The February 25, 1983 meeting was a very important one. While our finding of fact No. 36 reflects our rejection of plaintiff's proposed findings of fact Nos. 58 and 59, it is to be noted that plaintiff conceded in the latter proposed finding that "defendant requested that plaintiff prepare a development plan" but that plaintiff took the position that she should be furnished with an "appraisal for the period January 1, 1982 through December 31, 1982 in order to assist her in preparing a development plan." Paragraph 18 of the stipulation reflects the parties' agreement that "plaintiff did not do a development plan." While it is difficult to understand why plaintiff took the adamant position that she could not and would not attempt to prepare a development plan until defendant furnished her with an appraisal which set forth "specific deficiencies for the period January 1, 1982 through December 31, 1982" (quoted from plaintiff's rejected proposed finding of fact No. 59), there can be no doubt that plaintiff did take that position at the February 25, 1982 meeting and that she thereafter consistently maintained that position up to the time she was terminated for insubordination.

11. A copy of the April 1, 1983 memo is set forth on page 14 of Defendant's Exhibit No. 16.

advised defendant's house counsel of his action.[12]

39.* The next morning, Wednesday, April 6, 1983, plaintiff came to work at the regular time of 8:00 a.m. Later that morning, Mr. Von Sprecken advised her that she was on suspension, that she was not to come to work until the following Wednesday, April 13, 1983, that she was not being paid, that she was to leave, and that if she returned to work the next day, April 7, she would face possible termination. Sometime thereafter, plaintiff left the building.

40. Wednesday morning, April 13, 1983, plaintiff came to work at the regular time. Mr. Von Sprecken went to her desk and asked her to come at 8:30 a.m. to the office of Mr. Canada, who was out of town, to meet with him and Pat Kies, a Second Level management person who had been designated by Mr. Canada to be in charge of the Group during his absence. Von Sprecken said to plaintiff "We need to go over your development plan." Plaintiff responded by saying she never agreed to do the plan and for Von Sprecken to "quit bugging me about it." Von Sprecken said no more and left.[13]

41.* Plaintiff failed to appear in Canada's office at 8:30 a.m. and shortly thereafter Pat Kies went to plaintiff, asking her to come and plaintiff went with Kies to Canada's office, where Von Sprecken was waiting.

42. Thereupon, a conference ensued in Canada's office with Von Sprecken, Kies and plaintiff present. The conference started by a statement to plaintiff that they were present to discuss her development plan so that her performance could be brought up to a satisfactory level. The conference lasted at least one hour. During the conference, plaintiff displayed an attitude toward her supervisors, Kies and Von Sprecken, of defiance and insubordination. She repeatedly refused to do or to discuss a development plan. She insisted she was entitled to an appraisal before she could be required to work on a development plan. During the conference, she was warned on several occasions by Pat Kies not to use abusive language, but she persisted in doing so. She was told by Pat Kies that she was "skating on thin ice." Plaintiff was finally told that if she could not accept the fact that her work was unsatisfactory and the fact that she was required to work on a development plan without being furnished an appraisal, she would be terminated. Plaintiff still maintained her adamant position in regard to her need for an appraisal. Plaintiff never indicated that she would

12. Paragraph 19 of the parties' stipulation states that "During the afternoon of Tuesday, April 5, 1983, Mr. Von Sprecken suspended plaintiff for five work days without pay, stating that it was for insubordination." Our finding of fact No. 38 reflects our acceptance of Von Sprecken's trial testimony and our rejection of plaintiff's trial testimony in regard to what happened on April 5, 1983. We expressly find that plaintiff was in fact insubordinate and that she was in fact suspended for her insubordination. We find that Von Sprecken's April 5, 1983 memorandum for the file, see page 9–10 of Defendant's Exhibit No. 16, accurately recorded the time sequence and the substance of what happened on that day.

Plaintiff's proposed finding of fact No. 62 suggests that plaintiff was suspended for only "*alleged* insubordination" and that Von Sprecken took that action "after consulting with defendant's attorneys." Page 25 of Defendant's Exhibit No. 16 establishes that Von Sprecken consulted with defendant's house counsel before he and Canada met with plaintiff on February 25, 1983. While the evidence does not show, as plaintiff's rejected proposed finding of fact No. 62 erroneously assumes, that Von Sprecken consulted counsel immediately before plaintiff was suspended, we find that Von Sprecken properly consulted counsel before the February 25, 1983 meeting in regard to an increasingly difficult employee and that he properly reported to counsel that he had suspended plaintiff for insubordination on April 5, 1983.

13. The first sentence of our finding of fact No. 40 is taken from paragraph 20 of the parties' stipulation. The remainder of that finding of fact and our finding of fact No. 42, *infra,* reflects our acceptance of Von Sprecken's trial testimony, the accuracy of Von Sprecken's April 13, 1983 contemporaneous memorandum for the file (see pages 1–5 of Defendant's Exhibit 16), Patricia R. Kies' trial testimony, the accuracy of her contemporaneous April 13, 1983 memorandum for the file (see pages 4–17 of Defendant's Exhibit 15), and our rejection of plaintiff's trial testimony, all in regard to what happened on April 13, 1983 when plaintiff was terminated for insubordination.

ever work on a development plan until after she had been advised by Pat Kies that she was fired. It was only after plaintiff had been terminated that she said that she was willing to work on her development plan. Plaintiff, however, was advised that it was then too late. The conference was concluded shortly after Pat Kies had terminated plaintiff's employment with AT & T Long Lines for insubordination.[14]

43.* During plaintiff's employment with AT & T Long Lines, she remained at Level 12, First Level management. On April 1, 1982, her salary was increased to $36,200 per year. On April 1, 1983 plaintiff was advised her salary would remain the same.

44. Before, during and after plaintiff was hired by AT & T Long Lines, she was made no special promises or commitments by any employee of AT & T Long Lines concerning promotions or other conditions of work. She was told she had a First Level management job and would be expected to compete like everyone else for promotions or other programs such as AT & T's Management Development Program (MDP).

45. In regard to plaintiff's claim that she should have been promoted and that defendant's failure to promote her constituted discrimination against her because of her race, plaintiff proposed a general finding of fact No. 50 which stated that "From August, 1981 until February, 1983, there were numerous second-level job openings for which plaintiff was more qualified than the individuals selected to fill the position. Defendant's articulated business reasons for its failure to promote plaintiff were pretextual." Defendant's Exhibits 38, 39, 40, and 41 are cited to support that proposed finding of fact. We expressly reject plaintiff's proposed finding of fact No. 50 and further find that the four exhibits cited in support thereof do not, in fact, support the proposed finding of fact.

46. Plaintiff also proposed specific findings of fact in regard to particular employees: specifically, plaintiff proposed that we find that plaintiff "was more qualified than Marvin Von Sprecken" (plaintiff's proposed

finding of fact No. 35); that "plaintiff was more qualified than the white employee, Greg Ohmer" (plaintiff's proposed finding of fact No. 30); and that "the position was filled by Billie Sue Furnas, a white female, who was less qualified than plaintiff" (plaintiff's proposed finding of fact No. 49). We reject each of plaintiff's specific proposed findings of fact. We find that neither plaintiff's race nor the fact that she had filed a Charge of Discrimination or this pending lawsuit against AT & T played any part whatsoever in plaintiff's not being promoted during her employment with AT & T Long Lines or not being selected for programs such as MDP.

47. The Court further finds that plaintiff was not more qualified than Marvin Von Sprecken for the Accounting Staff Supervisor position filled by Mr. Von Sprecken, through lateral transfer, on March 15, 1981.

48. The Court further finds that plaintiff was not more qualified than Gregory Ohmer, an MDP candidate, for the Engineering Staff Supervisor position filled by Mr. Ohmer, through lateral transfer, on April 1, 1981.

49. The Court further finds that plaintiff was not more qualified than Billie Sue Furnas for the Accounting Staff Supervisor position filled by Ms. Furnas on June 1, 1982.

50. Plaintiff introduced into evidence a set of 15 inter-company job ads for which jobs plaintiff claimed she was more qualified than the successful candidates. (See Plaintiff's Exhibit No. 35). However, plaintiff was able to identify correctly the successful candidates for only one of these job vacancies, Greg Ohmer, an MDP candidate. During trial, defendant supplied the names of the persons filling 13 of these job vacancies (one job ad was cancelled and the other a "blanket" ad impossible to identify) and the reasons each was more qualified than plaintiff. (See Defendant's Exhibit No. 51).

The Court finds that each of these job openings was filled by a lateral transfer

14. See footnote 13 in support of our findings of fact Nos. 40, *supra,* and 42 above.

except one which was a promotion filled by Jesus Roman, also a minority candidate and more qualified for the job than plaintiff. We further find that Roman's promotion was not pretextual.

51. The Court finds that during the period of plaintiff's employment by AT & T Long Lines, there were a limited number of promotional opportunities available in the Kansas City area, due to the prevailing economic conditions. During this period economic factors and a surplus of Second, Third and Fourth Level managers contributed to the enforcement of a hiring freeze during the summer of 1980 (D.Ex. 20, 21), the restructuring and reduction of the number of management levels in June, 1981 (D.Ex. 25), and the adoption in May, 1982 of an incentive plan which encouraged voluntary retirement and pre-retirement termination of managers to curb the surplus. (D.Ex. 31, 47). We further find that during the entire period of time that plaintiff was employed in Mr. Canada's group no white person in that group was promoted to any position.

52. The Court finds, contrary to plaintiff's trial testimony, that Willis H. Canada did not tell plaintiff that he could not support her promotion because she had filed a Charge of Discrimination. We further find that Mr. Canada did not tell any person, in connection with plaintiff's name being submitted for promotion, that plaintiff had filed such Charge.[15]

53. The Court finds that the evidence establishes that because plaintiff filed a Charge of Discrimination and because of plaintiff's pending lawsuit, defendant was extremely cautious and careful about taking any disciplinary action against plaintiff. We expressly find that plaintiff was not harassed or retaliated against because she filed her Charge of Discrimination or this lawsuit. Indeed, we find that had plaintiff stated that she was willing to work on a development plan at any time before she was terminated, and particularly had plain-

tiff done so at the April 13, 1983 conference with Pat Kies and Marvin Von Sprecken, plaintiff would not have been terminated on that day.[16]

54. Plaintiff was not denied because of her race any moving and living expenses concerning her move from her job with Southwestern Bell in St. Louis to her new job with AT & T Long Lines in Kansas City.

55. The Court finds that the sole reason for defendant's suspension of plaintiff from work for five days on April 5, 1983 was for insubordination and not because of her race.

56. The Court finds that the sole reason defendant's termination of plaintiff's employment on April 13, 1983 was for insubordination and not because of her race.

### III. *Conclusions of Law*

Both parties, as would be expected in this combined Title VII and jury-waived Section 1981 case, cite and rely upon the same familiar Supreme Court cases of *United States Postal Service Board of Governors v. Aikens,* —— U.S. ——, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Board of Trustees v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); and the progeny of those cases. *See Danzl v. North St. Paul-Maplewood-Oakdale Independent School District No. 622,* 706 F.2d 813 (8 Cir.1983), for the Eighth Circuit's most recent application of the principles stated in those cases.

It is not necessary that we discuss those cases for the reason that this case, like most

---

**15.** Our finding of fact No. 52 reflects our express rejection of plaintiff's proposed finding of fact No. 42.

**16.** Our findings of fact in No. 53 and those stated in paragraphs 54 to 56, inclusive, *infra,* reflect our express rejection of plaintiff's proposed findings of fact 66 to 72, inclusive.

combined Title VII and jury-waived Section 1981 cases, turns on its facts, rather than on the resolution of any disputed questions of law.

Although we entertain substantial doubt in regard to whether plaintiff made a prima facie case of discrimination, we resolve all doubt in that regard in favor of the plaintiff and thus reach the question of whether, under the facts above stated, it can be said that plaintiff carried the ultimate burden of proving that the reasons articulated by the defendant for its action are, or are not, pretextual. We conclude that under all of the facts and circumstances of this case, plaintiff did not carry that burden and that defendant is entitled to a judgment in its favor in connection with all three counts of plaintiff's amended complaint.

We now state our additional conclusions of law:

1. This Court has jurisdiction of this action and the parties under Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e, *et seq.* and the Civil Rights Act of 1866, 42 U.S.C. § 1981.

2. American Telephone and Telegraph Company is an employer in an industry affecting commerce within the meaning of 42 U.S.C. § 2000e(b).

3. Defendant did not violate Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, by not promoting plaintiff or by not placing her in its Management Development Program (MDP) or any other work programs, or by not paying plaintiff's moving and living expenses, or any other expense, incurred in her move from St. Louis to start work for defendant in Kansas City.

4. Defendant did not violate Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* when it suspended plaintiff for five work days on April 5, 1983 or when it terminated plaintiff's employment with defendant on April 13, 1983.

5. Defendant did not violate Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, nor did defendant retaliate against plaintiff or harass plaintiff either because plaintiff filed a Charge of Discrimination against defendant or because plaintiff filed this lawsuit.

6. Defendant did not violate the Civil Rights Act of 1866, 42 U.S.C. § 1981, by not promoting plaintiff or by not placing her in its Management Development Program (MDP) or any other work programs, or by not paying plaintiff's moving and living expenses, or any other expenses, incurred in her move from St. Louis to start work for defendant in Kansas City.

7. Defendant did not violate the Civil Rights Act of 1866, 42 U.S.C. § 1981, when it suspended plaintiff for five work days on April 5, 1983 or when it terminated plaintiff's employment with defendant on April 13, 1983.

8. Defendant did not violate the Civil Rights Act of 1866, 42 U.S.C. § 1981, nor did defendant retaliate against plaintiff or harass plaintiff, either because plaintiff filed a Charge of Discrimination against defendant or because plaintiff filed this lawsuit.

9. Plaintiff is not entitled to any monetary or injunctive relief.

10. Defendant is entitled to judgment in regard to all three counts of plaintiff's first amended complaint.

For the reasons stated, it is

ORDERED (1) that all findings of fact and conclusions of law stated in this memorandum opinion shall be considered as findings and conclusions made pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. It is further

ORDERED (2) that the Clerk, in accordance with Rule 58, Federal Rules of Civil Procedure, shall prepare and set forth on a separate document an appropriate judgment for the defendant in regard to each of the three counts contained in plaintiff's first amended complaint. The Clerk shall consult with counsel for both sides as to the form of judgment and shall enter the same after such consultation.